UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

STATE OF NEW YORK, BASIL SEGGOS, as
Commissioner of the New York State Department of
Environmental Conservation, and the NEW YORK
STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION,

                              Plaintiffs,

              - against -

WILBUR ROSS, in his official capacity as Secretary of
the United States Department of Commerce, the
UNITED STATES DEPARTMENT OF COMMERCE,
the NATIONAL OCEANIC AND ATMOSPHERIC
ADMINISTRATION, and the NATIONAL MARINE
FISHERIES SERVICE, a/k/a NOAA Fisheries,

                          Defendants.

------------------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. _____

**COMPLAINT**

      Plaintiffs State of New York, Basil Seggos, as Commissioner of the New York

State Department of Environmental Conservation ("DEC"), and the DEC (together

"New York"), by their attorney, Letitia James, Attorney General of New York, bring

this action for judicial review of rules promulgated by defendants Wilbur Ross, in

his official capacity as Secretary of the U.S. Department of Commerce, the U.S.

Department of Commerce, the National Oceanic and Atmospheric Administration,

and the National Marine Fisheries Service (collectively "Commerce"), and allege as

follows, upon information and belief:

## NATURE OF THE ACTION

      1.     Summer flounder, also known as fluke, is one of the most sought after

saltwater fish along the mid-Atlantic seaboard.  Summer flounder has long been a

mainstay of the commercial fishing industry on New York's Long Island.

2. To manage the commercial fishery pursuant to the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 *et seq.* ("Magnuson-Stevens Act"), Commerce establishes an annual quota setting the total pounds of summer flounder that may be landed at east coast ports by commercial fishermen.[1] Until 2021, Commerce split the coastwide quota among the states in the fishery using an allocation formula based on state-by-state landings data from the 1980s ("1993 formula") and implemented by regulations that remained unchanged since promulgated by Commerce in 1993. 58 Fed. Reg. 49,937 (Sept. 24, 1993) ("1993 Allocation Rule").

3. The summer flounder fishery has geographically shifted over the intervening three decades, with the center of the fishery moving dramatically northeast to the waters off Long Island—yet under the 1993 Allocation Rule, New York continued to receive only 7.65% of the coastwide quota each year, while Virginia and North Carolina together received nearly 50%. The result has been devastating to New York fishermen, who frequently fish off Long Island within sight of boats that steam to and from southern ports and are permitted to catch and land far more summer flounder due to less restrictive limits for those states.

4. On December 14, 2020, Commerce replaced the 1993 Allocation Rule. 85 Fed. Reg. 80,661 ("2020 Allocation Rule"). The 2020 Allocation Rule keeps in place the 1993 formula except for any surplus fish in years of abundance, which are

---

[1] To "land" fish is to "begin offloading fish, to offload fish, or to enter port with fish." To "offload" is to move fish from a vessel. 50 C.F.R. § 648.2. "Landings" refers to the amount of fish landed, measured by weight.

distributed evenly among active states in the fishery ("2020 surplus formula"), resulting only in marginal quota increases for New York in those years. The Rule continues to ignore the substantial changes in the fishery.

5.      Under the Magnuson-Stevens Act, fishery management measures such as the 2020 Allocation Rule must be based upon the best scientific information available and must be fair and efficient. 16 U.S.C. § 1851(a)(2), (4), (5), (7).

6.      The 2020 Allocation Rule violates these standards because it retains the 1993 formula from the 1993 Allocation Rule, which is based on obsolete 1980s data reflecting a summer flounder fishery that no longer exists, rather than current distribution information that Commerce does not dispute. The 2020 Allocation Rule will thus perpetuate existing inequity for New York fishermen as boats travel extra hundreds of miles to catch fish near Long Island but land them in southern ports.

7.      Moreover, the Rule's redistribution of surplus fish using the 2020 surplus formula during abundant years has no basis in the current distribution of the fishery—nor in any other scientific information—but simply allocates additional quota on an equal basis among active fishery states, and fails to reflect that most commercial fishing for summer flounder occurs off New York's coast.

8.      The 2020 Allocation Rule is therefore arbitrary, capricious, and not in accordance with law under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

9.      For these same reasons, the "2021 Specifications Rule," 85 Fed. Reg. 82,946 (Dec. 21, 2020), which Commerce promulgated to apply the 2020 Allocation Rule in the 2021 season, is arbitrary, capricious, and not in accordance with law.

10. Accordingly, the Court should vacate the 2020 Allocation Rule and the state-by-state quota allocation in the 2021 Specifications Rule and remand for proceedings consistent with its opinion. The Court should not reinstate the 1993 Allocation Rule or the 2021 state-by-state allocation that was based on that rule because the 1993 Allocation Rule is based on the obsolete 1993 formula.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question); 16 U.S.C. § 1855(f) (judicial review under the Magnuson-Stevens Act); and 5 U.S.C. § 702 (the Administrative Procedure Act).

12. Venue over this action is proper in this District pursuant to 28 U.S.C. § 1391(e)(3) because New York resides here.

## THE PARTIES

13. Plaintiff State of New York, as a body politic and a sovereign entity, brings this action on behalf of itself, as owner of the fish within the state, and as *parens patriae*, trustee, guardian, and representative on behalf of all residents and citizens of New York, particularly those individuals who fish commercially for summer flounder in the waters of the State of New York and of the United States.

14. Plaintiff Basil Seggos is Commissioner of the New York DEC and, in that capacity, is responsible for the protection, propagation, and management of fish and fisheries of the State.

15. Plaintiff DEC is an executive department of the State of New York.

16.     Defendant Wilbur Ross is the Secretary of Commerce of the United States and, in that capacity, is authorized to promulgate rules regulating fishing within United States waters.

17.     Defendant United States Department of Commerce is an executive agency of the United States.

18.     Defendant National Oceanic and Atmospheric Administration ("NOAA") is a subdivision within the United States Department of Commerce.

19.     Defendant National Marine Fisheries Service ("NMFS," a/k/a NOAA Fisheries) is an operating branch within NOAA.  NMFS is delegated authority over the management, conservation, and exploitation of living marine resources found in federal waters.

## STATUTORY AND REGULATORY BACKGROUND

### A.     The Magnuson-Stevens Act

#### 1.     Management of Fisheries

20.     The Magnuson-Stevens Act, 16 U.S.C. §§ 1801 *et seq.*, is designed to conserve and manage fishery resources in United States waters and coastal areas. *Id.* § 1801(b).  A "fishery" is "(A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and (B) any fishing for such stocks."  *Id.* § 1802(13).

21.     In general, the Magnuson-Stevens Act manages fisheries in the waters between three miles and two hundred miles off the coast of the United

States ("federal waters") while states retain authority over waters up to three miles offshore of their respective coastlines ("state waters"). *See id.* § 1856(a).

22.     To regulate fisheries within its jurisdiction, the Act establishes eight regional fishery management councils subject to Commerce's oversight. *See generally id.* §§ 1852–54. The council that manages fisheries in the mid-Atlantic region, including the summer flounder fishery, is the Mid-Atlantic Fishery Management Council ("Mid-Atlantic Council"), composed of voting representatives from the states of that region and from NMFS. *See id.* § 1852(a)(1)(B).

23.     Fisheries in state waters off the Atlantic coast are regulated by the Atlantic States Marine Fisheries Commission pursuant to an interstate compact formed between the Atlantic states and approved by Congress. Pub. L. No. 77-539 (1942), *as amended by* Pub. L. No. 81-721 (1950). Summer flounder migrate seasonally between state and federal waters, so Commerce and the Mid-Atlantic Council coordinate joint regulatory authority over the summer flounder fishery with the Atlantic Fisheries Commission pursuant to the Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. §§ 5101 *et seq.*

### 2.     Fishery Management Plans

24.     Under Commerce oversight, each regional council manages the fisheries in its region by developing and updating fishery management plans consisting of conservation and management measures for each fishery, including include quotas, size limits, and gear restrictions. 16 U.S.C. §§ 1852(h), 1853.

25.     A regional council submits any new management plan, plan amendment, or implementing regulations to Commerce to review for consistency with the Magnuson-Stevens Act.  *Id.* §§ 1853(a), (c), 1854(a), (b).

26.     Commerce approves a management plan or plan amendment if it is consistent with the Act and disapproves (or partially approves) it if it is not consistent.  *Id.* § 1854(a)(1).  Similarly, Commerce promulgates regulations submitted by a regional council if they are consistent with the Act and returns them to the council for revision if not.  *Id.* § 1854(b)(1).

### 3.     The Magnuson-Stevens Act National Standards

27.     All fishery management plans and amendments, and all regulations to implement them, must be consistent with the ten National Standards established by the Magnuson-Stevens Act.  16 U.S.C. §§ 1851, 1854(a)(1), (b)(1).

28.     National Standard 2 requires that "[c]onservation and management measures shall be based upon the best scientific information available."  *Id.* § 1851(a)(2).

29.     National Standard 4 requires that "[c]onservation and management measures shall not discriminate between residents of different States.  If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges."  *Id.* § 1851(a)(4).

30. National Standard 5 requires that "[c]onservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources[.]" *Id.* § 1851(a)(5).

31. National Standard 7 requires that "[c]onservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." *Id.* § 1851(a)(7).

## B. <u>Management of the Summer Flounder Fishery</u>

32. The summer flounder fishery is governed by the fishery management plan for summer flounder and its implementing regulations codified at 50 C.F.R. §§ 648.100–648.110. Under these regulations, Commerce establishes a coastwide quota for each year that represents the total pounds of summer flounder that may be landed at east coast ports by commercial fishermen. *Id.* § 648.102.

33. For each year between 1993 and 2020, the coastwide commercial quota was distributed among the states in the fishery based on the state-by-state allocation formula in the 1993 Allocation Rule. Beginning in 2021, the commercial quota will be allocated according to the 2020 Allocation Rule.

34. Because summer flounder are jointly managed in state and federal waters due to their seasonal migratory patterns, the commercial landings quota and the state-by-state quotas approved by Commerce apply to summer flounder caught in both federal and state waters.

35.     When the 1993 Allocation Rule was adopted, the state allocations were based on commercial landings of summer flounder reported for the respective states between 1980 and 1989.

36.     The 1993 formula distributed the commercial landings quota for summer flounder as follows:

- 27.44585% to North Carolina;
- 21.31676% to Virginia;
- 16.72499% to New Jersey;
- 15.68298% to Rhode Island;
- 7.64699% to New York;
- 6.82046% to Massachusetts;
- 2.25708% to Connecticut;
- 2.03910% to Maryland;
- 0.04756% to Maine;
- 0.01779% to Delaware; and
- 0.00046% to New Hampshire.

37.     The 2020 Allocation Rule, to be codified at 50 C.F.R. § 648.102(c)(1), will continue to use the 1993 formula to allocate any coastwide quota up to 9.55 million pounds, which represents a rough average of recent annual coastwide quotas.  In years of abundance when the coastwide quota exceeds 9.55 million pounds, quota beyond 9.55 million pounds will be distributed evenly between active states in the fishery pursuant to the 2020 surplus formula, with North Carolina, Virginia, New Jersey, Rhode Island, New York, Massachusetts, Connecticut, and Maryland each receiving 12.375% of the surplus and Maine, Delaware, and New Hampshire dividing the remaining 1%.  Because any surplus is not expected to be a consequential amount, New York would receive only around 1% or 2% in additional quota share in years of moderate to significant abundance.

38.     Commerce promulgates the annual state-by-state landings quotas—along with other annual management measures, or "specifications"—through a rulemaking process.  *See* 50 C.F.R. § 648.102.

39.     The state-by-state quotas limit the summer flounder that may be landed at the ports in each state regardless of where the fish are caught.  Each state implements its own management measures (on top of fishery-wide rules) designed so that commercial summer flounder landings in the ports of that state do not exceed the state's assigned allocation of the annual commercial quota in the annual specifications.  These measures commonly include permitting or licensing requirements, periodic or seasonal landings quotas, and/or landings limits for individual vessels.

40.     In New York the DEC regulates the commercial summer flounder industry to keep landings in the state within New York's allocation.  To do so, DEC establishes quota periods throughout the year and distributes New York's share of the quota between those periods, with vessels subject to trip limits and/or weekly limits designed so that landings for a given period do not exceed the period quota. N.Y. Comp. Codes R. & Regs. tit. 6, § 40.1(i), (*l*).  DEC may tighten or loosen trip limits during a given period based upon projections of actual landings compared to that period's allocated landings.  *Id.* § 40.1(*l*)(3).  If DEC determines that landings will exceed the allocation for a given period, DEC must close the fishery for the remainder of the period for most permit holders.  *Id.* § 40.1(*l*)(4).

# FACTUAL ALLEGATIONS

## A.     Summer Flounder

41.      Summer flounder (*Paralichthys dentatus*), also known as fluke, is a demersal (bottom-dwelling) flatfish distributed from the Gulf of Maine through the waters off North Carolina. As an excellent food fish, summer flounder is a valuable species to the commercial fishing industry along the Atlantic coast.

42.      Summer flounder are concentrated inshore, in the ocean, bays, and estuaries, from late spring through early autumn, when the fish migrate to the outer continental shelf for the colder months. Spawning occurs during autumn and early winter, with the larvae carried by ocean currents toward coastal areas, where the development of post larvae and juveniles occurs.

43.      Because summer flounder move northeast up the Atlantic coast as they age and grow, the summer flounder population is spatially distributed with larger individuals more abundant toward northern latitudes. Commercial fishing for summer flounder occurs year-round, with the greatest activity between November and April.

## B.     Changes in Summer Flounder Distribution Since the 1980s

44.      By the 1980s, the summer flounder stock had been overfished and was severely depleted, reaching a low point in approximately 1989. This overfishing also truncated the average age and size of summer flounder as fewer fish reached older age and larger size. Because younger fish are more heavily distributed toward the southwest of the species' range, research shows that overfishing caused a southwest-shifting effect on the center of biomass of the stock,

toward waters near Virginia and North Carolina. Indeed, Commerce data indicate that in the 1980s, summer flounder were distributed most heavily between the southern mid-Atlantic waters east of Delaware, Maryland, and Virginia, and the waters east of Long Island and south of Rhode Island.

45. The geographic distribution of commercial fishing activity for summer flounder in the 1980s reflected this distribution. According to Commerce data, in 1983–1989, 46% or more of commercial summer flounder that were landed were caught in the southern mid-Atlantic—that is, in waters south of the southern tip of New Jersey. Meanwhile, 41% or less were caught in the northern mid-Atlantic and southern New England waters proximate to Long Island—that is, in waters east of New Jersey and New York, and south of Connecticut, Rhode Island, and Massachusetts. The remaining approximately 13% were caught further to the east or north of these waters.

46. Conservation and management measures implemented to address the depleted, overfished condition of the summer flounder fishery in the 1980s have allowed the stock to rebound. Summer flounder have increased in abundance, and age distribution rebounded from its truncated state, with more fish surviving to become older and larger. Commerce's most recent stock assessment for summer flounder indicates that the biomass of the stock remains multiple times greater than its average level in the 1980s.

47. Recent Commerce data show that the center of biomass of the summer flounder stock has shifted northeast since the 1980s. Researchers believe

this shift has occurred because older and larger summer flounder are distributed further northeast in the summer flounder's range, and/or due to other factors including ocean warming. This shift in the fishery's biomass is well-documented by Commerce and acknowledged in the environmental impact statement prepared to support the 2020 Allocation Rule ("2020 Allocation Rule EIS").[2] Trawl survey data indicate that the stock is now concentrated in the northern mid-Atlantic waters east of New Jersey and south of Long Island, and in the southern New England waters east of Long Island and south of Rhode Island and Massachusetts.

48.     Comparison of summer flounder distribution maps from 1985 and 2019 illustrates this shift.

49.     The first map shown depicts the results of a survey in the fall of 1985, prepared with Commerce's data by OceanAdapt researchers at Rutgers University, that shows the distribution of summer flounder split between a heavier concentration (red being the heaviest concentration) in the southern mid-Atlantic and a lighter concentration east of Long Island and south of southern New England.

50.     The second map shown depicts the results of a fall 2019 survey, prepared with Commerce's data by OceanAdapt, that shows decreased summer flounder biomass in the southern mid-Atlantic, some increased concentrations off the coasts of Delaware and New Jersey, and a heavy (red) distribution from the northern coast of New Jersey, along the coast of Long Island, and into the waters east of Long Island and south of southern New England.

---

[2] *Available at* https://www.mafmc.org/supporting-documents (visited Dec, 31, 2020).





51.     The northeast shift in the center of biomass of the summer flounder stock toward the waters proximate to Long Island has in turn driven geographic changes in commercial fishing activity, which the 2020 Allocation Rule EIS acknowledges and documents in detail.  In particular, the increase in summer flounder abundance and size in waters offshore of New York has been accompanied by an increase in commercial fishing for summer flounder in these waters, as reflected in catch data collected by Commerce.

52.     Commerce's data show that in 2016–2019, only approximately 10% of documented commercial summer flounder landings were taken from southern mid-Atlantic waters, while more than 87% were taken from northern mid-Atlantic and southern New England waters.  This 87% of the commercial catch is caught in waters within approximately 150 miles of Long Island and often much closer.  These same waters are as far as 400 miles or more from Virginia and North Carolina.

53.     A presentation at the February 2018 meeting of the Mid-Atlantic Council, attended by representatives from Commerce, corroborated this trend in commercial fishing concentration and catch.[3]  Researchers presented their findings (since published in a peer-reviewed journal) using Commerce data that the average commercial catch location for summer flounder has shifted from the southern mid-Atlantic waters offshore of Delaware, Maryland, and Virginia in the mid-late 1990s to the northern mid-Atlantic waters south of eastern Long Island in the early-mid 2010s.  In 2014, the average commercial catch location was approximately 90 miles

_____

[3] *Available at* http://www.mafmc.org/briefing/february-2018.

from Montauk, New York, approximately 300 miles from Hampton, Virginia, and approximately 450 miles from Beaufort, North Carolina.

54.     The researchers also showed that the northerly shift in fishing activity reflects fishing by boats that travel between southern ports and the waters near Long Island due to increased abundance of summer flounder in northern waters.  The 2020 Allocation Rule EIS acknowledges and documents this pattern.

**C.     The 2020 Allocation Rule**

55.     New York has advocated for both Commerce and the Mid-Atlantic Council to reconcile the state-by-state quota allocation with the best available science and bring about greater equity for New York fishermen in the summer flounder fishery, using current information about the northeast shift in the fishery that neither Commerce nor other states in the fishery dispute, to develop a new state-by-state formula to allocate the commercial quota.

56.     In spring 2020, the Mid-Atlantic Council proposed the 2020 Allocation Rule to Commerce in the form of an amendment to the summer flounder management plan that would retain the 1993 formula except modify it in years of abundance by distributing surplus quota, if any, evenly among active states in the fishery, pursuant to the 2020 surplus formula.  New York's representatives on the Council had voted against advancing the 2020 Allocation Rule because it made only minor changes to the 1993 formula without accounting for the substantial shift in the fishery since 1993.

57.     In support of the amendment, the Council prepared the 2020 Allocation Rule EIS in cooperation with Commerce.  The EIS declares as the 2020 Allocation Rule's purpose to  "[c]onsider modifications to [the] commercial quota allocation" because the "[c]urrent commercial allocation was last modified in 1993 and is perceived by many as outdated given its basis in 1980–1989 landings data" and because "[s]ummer flounder distribution, biomass, and fishing effort have changed since then."  2020 Allocation Rule EIS at 3.  Yet the EIS provides no scientific basis for retaining the 1993 formula, which is based on 1980s data.  It also provides no scientific basis for the 2020 surplus formula, which does not account for the geospatial distribution of the fishery—or any other objective factors—but simply allocates surplus quota, if any, evenly among active fishery states.

58.     On July 29, 2020, Commerce posted notice of availability of the proposed amendment, and on August 12, 2020, posted proposed implementing regulations for public comment.  85 Fed. Reg. 45,571; *id.* at 48,660.

59.     On September 11, 2020, New York timely filed comments opposing the 2020 Allocation Rule as contrary to the Magnuson-Stevens Act requirements that fishery management measures be based on the best available scientific information (National Standard 2) and be fair (National Standard 4) and cost-efficient (National Standards 5 and 7).  As New York's comments explained, the 2020 Allocation Rule fails to meaningfully account for the shift in the fishery since the 1980s, and instead perpetuates the scientifically-outdated allocation formula that is unfair to New York and woefully inefficient by tightly constricting landings

of summer flounder on Long Island near where the fish now are being caught in greatest numbers, and greatly limiting permissible fishing by Long Island boats that are based closest to the heart of the fishery.

60.     On October 19, 2020, Commerce issued a letter to the Mid-Atlantic Council approving the amendment to be implemented by the 2020 Allocation Rule.

61.     On December 14, 2020, Commerce promulgated the 2020 Allocation Rule. 85 Fed. Reg. 80,661.

**D.     The 2021 Specifications Rule**

62.     On November 17, 2020, Commerce proposed the 2021 Specifications Rule to distribute the quota among the states according to the 2020 Allocation Rule. 85 Fed. Reg. 75,253. The 2021 state-by-state quotas in the proposed 2021 Specifications Rule would replace previously established 2021 state-by-state quotas based on the 1993 Allocation Rule. *See* 84 Fed. Reg. 54,041 (Oct. 9, 2019) (2020–2021 Specifications Rule). New York challenged its 2020 and 2021 quotas in the 2020–2021 Specifications Rule and the application of the 1993 Allocation Rule to set those quotas in an action that remains pending before this Court. *New York v. Ross*, Case No. 1:19-cv-09380-MKV (S.D.N.Y. filed Oct. 10, 2019).[4]

63.     On December 2, 2020, New York submitted comments to Commerce explaining that the proposed state quotas for 2021 and the application of the 2020

_____

[4] New York also previously challenged its 2019 quota and the application of the 1993 Allocation Rule to set that quota, which case was never decided. *New York v. Ross*, Case No. 2:19-cv-00259-SJF-ARL (E.D.N.Y. filed Jan. 14, 2019).

Allocation Rule to calculate those quotas are contrary to the Magnuson-Stevens Act for the same reasons that the 2020 Allocation Rule itself violates the Act.

64. After promulgating the 2020 Allocation Rule, on December 21, 2020, Commerce published the 2021 Specifications Rule. 85 Fed. Reg. 82,946. Using the formula in the 2020 Allocation Rule, the 2021 specifications provide that less than 1.1 million pounds of summer flounder may be landed at New York ports in 2021 (8.6% of the coastwide quota) while nearly 5.4 million pounds may be landed at ports in North Carolina and Virginia together (43.11% of the coastwide quota). *Id.* at 82,947.

**E.** **The 2020 Allocation Rule and 2021 Specifications Rule Are Arbitrary, Capricious, and Not in Accordance with Law**

65. Except for surplus fish in abundant years, the 2020 Allocation Rule and the state-by-state quota allocation in the 2021 Specifications Rule are based entirely on the 1993 formula, which relies on obsolete 1980–1989 landings data, even though more reliable and up-to-date information about the fishery is available to Commerce that shows a dramatic northeast shift in the fishery.

66. The 2020 surplus formula provided in the 2020 Allocation Rule and implemented in the 2021 Specifications Rule also fails to account for the northeast shift; indeed, the surplus mechanism has no stated scientific basis.

67. As a result, the 2020 Allocation Rule and 2021 Specifications Rule are arbitrary and capricious and are not "based upon the best scientific information available," and are therefore inconsistent with National Standard 2 of the Magnuson-Stevens Act, 16 U.S.C. § 1851(a)(2).

68.     Because the 2020 Allocation Rule and 2021 Specifications Rule use the 1993 formula except for surplus fish, and because the 2020 surplus formula does not account for the shift in the fishery, the Rules are unfair to fishermen and other market participants (such as pack houses and other downstream businesses) in New York by continuing to skew fishing privileges to the fishing industry in North Carolina and Virginia, contrary to the geographic distribution of the fishery, and without any rational conservation basis.

69.     As a result, the 2020 Allocation Rule and 2021 Specifications Rule "discriminate between residents of different States," and are not "fair and equitable to all . . . fishermen" or "reasonably calculated to promote conservation," and are therefore inconsistent with National Standard 4, *id.* § 1851(a)(4).

70.     Because the 2020 Allocation Rule and 2021 Specifications Rule use the 1993 formula except for surplus fish, and because the 2020 surplus formula does not account for the shift in the fishery, the Rules result in substantial waste by continuing to distribute significant shares of the commercial quota to southern states far from the center of the fishery.  As a result, boats landing summer flounder in southern ports must, on average, travel further from where they have caught summer flounder to their port of landing than if those same flounder were landed in New York ports.  Besides greater inputs of travel time, this longer round trip also requires greater use of fuel and results in greater wear-and-tear on vessels. Additionally, many of these fish landed in southern ports are transported by trucks back to New York for sale in local markets, largely through the Fulton Fish Market

in the Bronx, New York's primary seafood distribution hub, adding further to the inefficiency of the fishery.

71.     As a result, the 2020 Allocation Rule and 2021 Specifications Rule do not "where practicable, consider efficiency in the utilization of fishery resources" or "where practicable, minimize costs and avoid unnecessary duplication," and are therefore inconsistent with National Standards 5 and 7, *id*. § 1851(a)(5), (7).

72.     The 1993 Allocation Rule is arbitrary, capricious, and not in accordance with law because it is based on the 1993 formula.  As a result, the reinstatement of that rule would not bring Commerce into compliance with the Magnuson-Stevens Act or provide appropriate relief for New York.

73.     The 2020–2021 Specifications Rule is arbitrary, capricious, and not in accordance with law because it is based on the 1993 Allocation Rule.  As a result, the reinstatement of the 2021 state-by-state quotas for commercial landings of summer flounder in that rule would not bring Commerce into compliance with the Magnuson-Stevens Act or provide appropriate relief for New York.

**F.     Impacts on New York**

74.     The State of New York owns the summer flounder in New York waters.  N.Y. Envtl. Conserv. Law § 11-0105.

75.     New York has a proprietary and sovereign interest in summer flounder in New York waters.

76.     New York is injured by the 2020 Allocation Rule and by the quota imposed by Commerce in the 2021 Specifications Rule because they deprive New

York of its fair and reasonable share of summer flounder, with concomitant economic injury to the state and its fishermen.

77. The 2020 Allocation Rule and 2021 Specifications Rule impose a greater regulatory burden on New York regulators and regulated fishermen, because they require New York to impose and enforce more stringent management measures on the summer flounder fishery in order to comply with its small share under the 2020 Allocation Rule, compared with an allocation system based on the current distribution of the summer flounder fishery and dramatic shifts in that distribution. New York's regulatory burden includes smaller trip limits (allowed pounds landed) and closer monitoring of catch by New York permitted boats, with more frequent closures of the fishery.

78. As a state, New York has a sovereign and quasi-sovereign interest in ensuring that the allocation among the states of landings of summer flounder caught in New York and federal waters is fair and reasonable and complies with the Magnuson-Stevens Act.

79. New York is injured by the 2020 Allocation Rule and the 2021 Specifications Rule because they do not treat New York fairly and reasonably as compared to other states and are inconsistent with the Magnuson-Stevens Act.

80. New York has a quasi-sovereign interest in ensuring that its residents, including fishermen and market participants in the commercial fishing industry, have fair and reasonable access to summer flounder in New York and federal waters.

81.     Historically, fishing for summer flounder has been an essential component of New York's commercial fishing industry.  Summer flounder's high value, ready availability, and widespread popularity with consumers make this fishery a reliable source of revenue for New York fishermen.  New York has issued a little over 300 commercial summer flounder permits in each year from 2012 to 2016.  On average, 214 of those permits showed summer flounder activity each year during that same time frame.

82.     Compared to states with the largest shares of the commercial landings quota (North Carolina, Virginia, New Jersey, and Rhode Island), New York's commercial summer flounder landings are higher during the late spring and summer, when the fish are closer to shore, and a comparatively greater share of New York's landings are from smaller vessels fishing in state waters, rather than larger vessels fishing in federal waters.  New York fishermen catch more summer flounder closer to their home ports than fishermen from the other states but are subject to stringent limits on commercial landings of summer flounder in New York ports—limits that are far more stringent than those applicable to out-of-state boats fishing in waters just off Long Island.  This has made summer flounder fishing no longer an economically viable choice for many fishermen based in New York because the limited revenue generated by a low volume trip often cannot offset the costs, including for fuel, time, wages, overhead, and vessel wear-and-tear.

83.     For many fishermen, this has foreclosed or severely restricted participation in the fishery, and New York's commercial summer flounder industry

has suffered considerably.  In colder months, when summer flounder are further offshore, it makes little economic sense to travel round trip to and from port under the daily or weekly limits that New York imposes to meet its landings quota.  This effectively limits many fishermen to making small day trips in the warmer months—rarely worth the cost or effort for larger vessels—or to landing summer flounder as a secondary catch or bycatch on trips for other fish species.  For those New York fishermen who continue to fish for summer flounder in waters in or near New York, they must often do so in direct sight of vessels licensed to land summer flounder in Virginia or North Carolina—pursuing the same fish at the same time—who may catch and land those same fish in their home ports in far greater quantities.

84.    The 2020 surplus formula in the 2020 Allocation Rule provides only a marginal and contingent departure from the status quo and therefore perpetuates existing inequity.

85.    While New York fishermen may purchase licenses to land summer flounder in states with larger quota allocations like North Carolina and Virginia, the price of such licenses—often in the range of multiple tens of thousands of dollars—has been prohibitive for many, especially for those operating smaller vessels.  Some operators of larger New York-based boats have made the business decision to purchase out-of-state licenses.  These fishermen catch summer flounder in the waters near Long Island—the center of the fishery—and then travel to out-of-state ports to land their catch, only to return to their home ports in New York.

86.     In favorable weather conditions, it takes a 70-foot vessel approximately eight hours to travel from prime summer flounder fishing waters to Montauk, New York.  In contrast, it takes 30 or more hours to travel to port in Virginia, and 48 or more hours to travel to port in North Carolina—with commensurate increases in fuel use and vessel wear-and-tear.  If these New York fishermen, already subject to the added cost of purchasing an out-of-state license, were able to land more of their summer flounder catch in their home ports, the time and cost savings would be substantial.  The fishermen would also be able to support more downstream industries in their port communities, such as pack houses that pack landed fish to be shipped to market.

87.     Meanwhile, summer flounder that is landed in New York is highly sought after by dealers in New York.  Indeed, within the seafood industry, Commerce's data show that New York has among the largest wholesale/distribution and retail sectors of any state in the summer flounder fishery, together with New Jersey and Massachusetts.  Much of the seafood supplied to the New York City metropolitan area passes through the New Fulton Fish Market in the Bronx, New York.  Yet as one seller at the market estimates, no more than 5% of summer flounder he handles at Fulton has been landed in New York, while a majority has been landed in Virginia, North Carolina, or New Jersey.

88.     After decades of hardship under the 1993 Allocation Rule, the 2020 Allocation Rule and the 2021 Specifications Rule continue to injure the residents of

New York, particularly fishermen and other market participants in the commercial fishing industry.

## FIRST CLAIM FOR RELIEF

### The 2020 Allocation Rule
### Is Not in Accordance with Law

89.     New York hereby incorporates by reference the allegations contained in Paragraphs 1 through 88 as if fully set forth herein.

90.     The 2020 Allocation Rule, facially and as applied in the 2021 Specifications Rule, is not based upon the best scientific information available and is therefore inconsistent with National Standard 2 of the Magnuson-Stevens Act, 16 U.S.C. § 1851(a)(2).

91.     The 2020 Allocation Rule, facially and as applied in the 2021 Specifications Rule, discriminates against New York residents and allocates fishing privileges in a way that is unfair and inequitable to fishermen and others in New York without any reasonable conservation basis.  The formula is therefore inconsistent with National Standard 4 of the Magnuson-Stevens Act, *id.* § 1851(a)(4).

92.     The 2020 Allocation Rule, facially and as applied in the 2021 Specifications Rule, fails to consider efficiency in the utilization of fishery resources where practicable and is therefore inconsistent with National Standard 5 of the Magnuson-Stevens Act, *id.* § 1851(a)(5).

93.     The 2020 Allocation Rule, facially and as applied in the 2021 Specifications Rule, fails to minimize costs where practicable and is therefore

inconsistent with National Standard 7 of the Magnuson-Stevens Act, *id*.

§ 1851(a)(7).

94.     Accordingly, the 2020 Allocation Rule should be held unlawful and vacated under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

95.     The 1993 Allocation Rule should not be reinstated because it is also inconsistent with the Magnuson-Stevens Act.

## SECOND CLAIM FOR RELIEF

### The 2020 Allocation Rule
### Is Arbitrary and Capricious

96.     New York hereby incorporates by reference the allegations contained in Paragraphs 1 through 95 as if fully set forth herein.

97.      The 2020 Allocation Rule, facially and as applied in the 2021 Specifications Rule, is arbitrary and capricious because it uses the 1993 formula, which is inconsistent with the Magnuson-Stevens Act, relies on obsolete landings data, and fails to account for substantial changes to the summer flounder fishery since those data were compiled, as well as the current state of the fishery.

98.     The 2020 Allocation Rule, facially and as applied in the 2021 Specifications Rule, is also arbitrary and capricious because it uses the 2020 surplus formula, which is inconsistent with the Magnuson-Stevens Act, has no scientific basis, and fails to account for substantial changes to the summer flounder fishery and its current state.

99.     Accordingly, the 2020 Allocation Rule should be held unlawful and vacated under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

100.     The 1993 Allocation Rule should not be reinstated because it also based on obsolete landings data and thus arbitrary and capricious.

### THIRD CLAIM FOR RELIEF

**The 2021 Specifications Rule
Is Not in Accordance with Law**

101.     New York hereby incorporates by reference the allegations contained in Paragraphs 1 through 100 as if fully set forth herein.

102.     The state-by-state quota allocation for commercial landings of summer flounder in the 2021 Specifications Rule is not based upon the best scientific information available and is therefore inconsistent with National Standard 2 of the Magnuson-Stevens Act, 16 U.S.C. § 1851(a)(2).

103.     The 2021 allocation discriminates against New York residents and allocates fishing privileges in a way that is unfair and inequitable to fishermen and others in New York, without any reasonable conservation basis.  The quota allocation is therefore inconsistent with National Standard 4 of the Magnuson-Stevens Act, *id*. § 1851(a)(4).

104.     The 2021 allocation fails to consider efficiency in the utilization of fishery resources where practicable and is therefore inconsistent with National Standard 5 of the Magnuson-Stevens Act, *id*. § 1851(a)(5).

105.     The 2021 allocation fails to minimize costs where practicable and is therefore inconsistent with National Standard 7 of the Magnuson-Stevens Act, *id*. § 1851(a)(7).

106. Accordingly, the 2021 Specifications Rule should be held unlawful and the state-by-state commercial summer flounder quota allocation for 2021 should be vacated under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

107. The 2021 state-by-state quotas for commercial landings of summer flounder in the 2020–2021 Specifications Rule should not be reinstated because that rule is also inconsistent with the Magnuson-Stevens Act.

## FOURTH CLAIM FOR RELIEF

### The 2021 Specifications Rule
### Is Arbitrary and Capricious

108. New York hereby incorporates by reference the allegations contained in Paragraphs 1 through 107 as if fully set forth herein.

109. The 2021 Specifications Rule is arbitrary and capricious because the state-by-state quota allocation for commercial landings of summer flounder is based on the 1993 formula, which is inconsistent with the Magnuson-Stevens Act, relies on obsolete landings data, and fails to account for substantial changes to the summer flounder fishery since those data were compiled, as well as the current state of the fishery.

110. The 2020 Specifications Rule is also arbitrary and capricious because it uses the 2020 surplus formula, which is inconsistent with the Magnuson-Stevens Act, has no scientific basis, and fails to account for substantial changes to the summer flounder fishery and its current state.

111.    Accordingly, the 2021 Specifications Rule should be held unlawful and the state-by-state commercial summer flounder quota allocation for 2021 should be vacated under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

112.    The 2021 state-by-state quotas for commercial landings of summer flounder in the 2020–2021 Specifications Rule should not be reinstated because that rule is also arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, New York requests judgment in its favor and against Commerce upon the claims set forth above, and requests that this Court enter judgment against Commerce as follows:

1.    Declaring that the 2020 Allocation Rule, facially and as applied in the 2021 Specifications Rule, is arbitrary, capricious, and not in accordance with law under 5 U.S.C. § 706(2)(A);

2.    Vacating the 2020 Allocation Rule without reinstating the 1993 Allocation Rule and remanding for proceedings consistent with the foregoing declaration;

3.    Declaring that the 2021 Specifications Rule is arbitrary, capricious, and not in accordance with law under 5 U.S.C. § 706(2)(A);

4.    Vacating the state-by-state quotas for commercial landings of summer flounder in the 2021 Specifications Rule without reinstating the 2021 state-by-state quotas in the 2020–2021 Specifications Rule and remanding for proceedings consistent with the foregoing declaration;

5.     Awarding New York its costs of litigation pursuant to Fed. R. Civ.

P. 54 or any other appropriate authority; and

6.     Ordering such other and further relief as the Court deems just and

proper.

Dated: New York, New York
          January 13, 2021

                              LETITIA JAMES
                              Attorney General of the State of New York
                              *Attorney for Plaintiffs*

                         By:  /s/ Channing Wistar-Jones
                              Assistant Attorney General

                              Monica Wagner
                              Deputy Bureau Chief

                              Andrew J. Gershon
                              Senior Counsel for Enforcement

                              Environmental Protection Bureau
                              28 Liberty Street, 19th Floor
                              New York, NY 10005
                              (212) 416-8082
                              channing.jones@ag.ny.gov