UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____3/29/2022____
```

STATE OF NEW YORK, BASIL SEGGOS, as
Commissioner of the New York State Department of
Environmental Conservation, and the NEW YORK
STATE DEPARTMENT OF ENVIRONMENTAL
CONSERVATION,

                                    Plaintiffs,

                    -against-

Gina M. Raimondo, in her official capacity as
Secretary of the United States Department of
Commerce, the UNITED STATES DEPARTMENT
OF COMMERCE, the NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION, and the
NATIONAL MARINE FISHERIES SERVICE, a/k/a
NOAA Fisheries,

                                    Defendants.

1:21-cv-00304 (MKV)

**OPINION AND ORDER
DENYING PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT AND GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

MARY KAY VYSKOCIL, United States District Judge:

    Plaintiffs, the State of New York, Basil Seggos as Commissioner of the New York State

Department of Environmental Conservation, and the New York Department of Environmental

Conservation (collectively, "New York"), bring this action against Gina M. Raimondo, in her

official capacity as Secretary of the United States Department of Commerce (the "Secretary"),[1]

the United States Department of Commerce ("DOC"), the National Oceanic and Atmospheric

Administration ("NOAA"), and the National Marine Fisheries Service ("NMFS"), also known as

NOAA Fisheries (collectively, "Commerce"), challenging regulations that establish annual

quotas for commercial fishing of summer flounder, or fluke, among mid-Atlantic states.  New

York seeks summary judgment on a four-count complaint that these regulations are not in

---

[1] Gina M. Raimondo, Secretary of the Department of Commerce has now been automatically substituted as a
defendant pursuant to Rule 25(d).

accordance with the Magnuson-Stevens Fishery Conservation and Management Act (the

"MSA"), 16 U.S.C. §§ 1801 *et seq.*, and are arbitrary and capricious under the Administrative

Procedure Act (the "APA"), 5 U.S.C. § 706(2)(A).  Commerce has cross-moved for summary

judgment.  For the following reasons, New York's Motion for Summary Judgment is denied and

Commerce's Motion for Summary Judgment is granted.

## **BACKGROUND**

### I.   **The Magnuson-Stevens Act**

The MSA establishes a national program for conservation and management of fishery

resources.  16 U.S.C. § 1801(a)(6).  Under the MSA, the federal government has jurisdiction

over fishery resources within the exclusive economic zone ("EEZ"), which encompasses ocean

waters from three miles offshore to 200 miles offshore.  16 U.S.C. §§ 1801(a)(6), 1811(a).

NMFS is the federal agency that, acting under authority delegated from the Secretary of

Commerce, is responsible for managing those fisheries pursuant to the MSA.[2]  States maintain

jurisdiction over waters up to three nautical miles off their coastlines.  16 U.S.C. § 1856.

The MSA establishes eight regional councils responsible for developing and

recommending to NMFS federal fishery management plans ("FMPs") governing the fishery

within their respective geographic areas.  16 U.S.C. § 1801(b)(4); *Nat'l Res. Def. Council, Inc. v.

Daley*, 209 F.3d 747, 749 (D.C. Cir. 2000).  The Mid-Atlantic Fishery Management Council (the

"Mid-Atlantic Council"), of which New York is a voting member, is responsible for

recommending FMPs to NMFS for federal fisheries in the Atlantic Ocean seaward of New York,

---

[2] The federal official responsible for fishery management is nominally the Secretary of Commerce, *see* 16
U.S.C. § 1802(34), but in practice she delegates much of her authority and many of her preliminary duties to NMFS.
*See C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1558 & n.1 (D.C. Cir. 1991); *N. Carolina Fisheries Ass'n, Inc. v.
Gutierrez*, 518 F. Supp. 2d 62, 71 (D.D.C. 2007).

New Jersey, Delaware, Pennsylvania, Maryland, Virginia, and North Carolina.  *See* 16 U.S.C.

§ 1852(a)(1)(B).

The MSA requires that federal FMPs be consistent with ten "national standards."  *See* 16

U.S.C. § 1851(a).  As relevant here, the ten standards include, but are not limited to:

> (2) Conservation and management measures shall be based upon the best scientific information available.
>
> .  .  .
>
> (4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.
>
> (5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.
>
> .  .  .
>
> (7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.
>
> (8) Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities
>
> .  .  .
>
> (10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

16 U.S.C. § 1851(a).  NMFS, by and through the authority of the Secretary, is charged with determining whether these standards have been met before approving proposed FMPs and promulgating rules to implement them. 16 U.S.C. § 1854(a).

The management of fisheries within state waters, including inland waters and coastal waters extending three miles seaward from shore, is subject to regulation by the states under their police powers.  *See* 16 U.S.C. § 1856.  In 1942, the fifteen Atlantic states, including New York, and the District of Columbia entered into an interstate compact establishing the Atlantic State Marine Fisheries Commission (the "ASMFC" or "Atlantic States Commission"), which was approved by Congress pursuant to Article I, Section 10, clause 3 (the "Compact Clause") of the United States Constitution, for the purpose of "promot[ing] the better utilization of the fisheries . . . of the Atlantic seaboard by the development of a joint program for the promotion and protection of such fisheries."  Pub. L. 77–539 (1942), as amended by Pub. L. 81–721 (1950) ("ASMFC Compact"), Art. I.

## II.    Regulations Of The Summer Flounder Fishery

### A.  The Atlantic Coastal Fisheries Cooperative Management Act

Summer flounder, the species of fish at issue in this case, are unique in that they exhibit strong seasonal inshore-offshore movement.  AR 2562.[3]  Essentially, summer flounder normally inhabit shallow coastal and estuarine waters during the warmer months, within the three-

---

[3] "AR" refers to the administrative record, *i.e.*, the full record that was before the agency at the time of the decision. *See Comprehensive Cmty. Dev. Corp. v. Sebelius*, 890 F. Supp. 2d 305, 308 (S.D.N.Y. 2012).

4

nautical-mile limit subject to state regulations, but remain further offshore during the fall and winter, in the EEZ subject to federal regulation.  AR 2562, 2568.

In 1993, Congress enacted the Atlantic Coastal Fisheries Cooperative Management Act, Pub.L. 103–206, 16 U.S.C. §§ 5101–5108 (the "Atlantic Coastal Act"), to promote the conservation of "[c]oastal fishery resources that migrate, or are widely distributed, across the jurisdictional boundaries of two or more of the Atlantic States and of the federal Government." 16 U.S.C. §§ 5101(a)(3), (b).  The Atlantic Coastal Act calls for the coordination of federal and state efforts concerning inter-jurisdictional fisheries, such as the summer flounder fishery.  16 U.S.C. § 5101(a)(3).  The Atlantic Coastal Act provides that in preparing coastal FMPs for a fishery located in both state waters and the EEZ, the "[Atlantic States] Commission shall consult with appropriate Councils to determine areas where such coastal fishery management plan[s] may complement Council fishery management plans."  16 U.S.C. § 5104(a)(1).

**B.  The Summer Flounder FMP And 1993 Allocation Rule**

The initial summer flounder management plan was prepared by the Atlantic States Commission in 1982.  AR 2568.  In 1988, the Mid-Atlantic Council formulated an FMP that was based on the Atlantic States Commission plan.  *See* AR 2568.  In 1992, that FMP was amended to include a number of management measures, including a commercial summer flounder state-by-state allocation.  57 Fed. Reg. at 57,373.  Each state's allocation—the percentage that may be "landed" or brought to port in each state—was calculated from each state's percentage of summer flounder landings in the years 1980 through 1989.  57 Fed. Reg. at 57,359.  Under the state-by-state quota system, all summer flounder landed for sale in a state are applied against that state's annual commercial quota, regardless of where in the ocean the summer flounder were harvested or caught.  57 Fed. Reg. at 57,365, 57,373.  All member states of the Atlantic States

Commission, including New York, voted in favor of the state-by-state quota system in 1992.  57 Fed. Reg. at 57,359.

In 1993, the state-by-state quotas were revised based on new information provided by the State of Connecticut.  The allocation quotas were finalized by the Mid-Atlantic Council and the Atlantic States Commission and adopted by NMFS in Amendment 4 (then codified at 50 C.F.R. § 625.20; now found at 50 C.F.R. § 648.102(c)(1)(i)) (the "1993 Allocation Rule").  Under the 1993 Allocation Rule, the state-by-state quotas were set as follows: Maine 0.04756%; New Hampshire 0.00046%; Massachusetts 6.82046%; Rhode Island 15.68298%; Connecticut 2.25708%; New York 7.64699%; New Jersey 16.72499%; Delaware 0.01779%; Maryland 2.03910%; Virginia 21.31676%; North Carolina 27.44584%.  58 Fed. Reg. 49,937 (Sept. 24, 1993).

### C.  The 2020 Allocation Rule

In September 2014, the Mid-Atlantic Council announced its intent to prepare an environmental impact statement for a broad management action addressing several categories of issues related to summer flounder.  *See* 79 Fed. Reg. 55,432; AR 234-236.  A draft environmental impact statement was issued in April 2018 (the "draft EIS") and stated that the Mid-Atlantic Council was considering "whether modifications to the commercial quota allocation are appropriate, and if so, how the quota should be re-allocated."  AR 1112.  It explained that there was a perception "by many" that the state-by-state quotas, which had not been modified since 1993, were outdated because they were based on 1980-1989 landings data.  AR 1112.  The draft EIS acknowledged that summer flounder distribution, biomass,[4] and fishing

---

[4] Fisheries biomass is defined as the "weight (whole-body, wet weight) of the in-water part of fish (and invertebrate) populations that is vulnerable to fishing gears."  M.L.D. Palomares et al., *Fishery biomass trends of exploited fish populations in marine ecoregions, climatic zones and ocean basins*, 243 Estuarine, Coastal and Shelf Science 106896 (Sept. 30, 2020).

effort have changed and "some believe initial allocations may not have been equitable or were based on flawed data; therefore, stakeholders requested evaluation of alternative allocation systems." AR 1112.

The draft EIS proposed alternatives to the commercial summer flounder state-by-state quotas, AR 1144-1165, including a plan where the quota distribution under either a five- or ten-year average would be based upon the 1993 Allocation Formula, but any quota above that average would be distributed evenly between certain of the Atlantic states. AR 2598. New York submitted comments to the Mid-Atlantic Council, the Atlantic States Commission, and NMFS objecting to the implementation of any of these alternatives and proposing its own plan. AR 1831–34. Specifically, New York proposed two alternative plans: (1) that NMFS eliminate a state-by-state allocation for an interim period and use that time to gather updated data about summer flounder catch; or (2) that NMFS update the allocation formula to reflect the current summer flounder catch distribution. AR 1834.

At a joint meeting in March 2019, the Mid-Atlantic Council and Atlantic States Commission voted to approve an amendment to the FMP that would revise the commercial summer flounder state-by-state quotas. AR 1929. The Mid-Atlantic Council and Atlantic States Commission adopted an alternative allocation system (the "2020 Allocation Rule"). Under the 2020 Allocation Rule, the allocation formula from the 1993 Allocation Rule would be used to allocate any coastwide quota up to 9.55 million pounds. AR 2951–54. In any years where the catch quota exceeded 9.55 million pounds, the excess quota would be subject to a modified formula. AR 2951–54. Under that modified formula, Maine, Delaware, and New Hampshire would split 1% of the excess quota and the rest of the mid-Atlantic states would evenly split the remainder. AR 2951–54. Accordingly, under the 2020 Formula, New York is allocated

7.64699% of the coastwide quota up to 9.55 million pounds and then 12.375% of any coastwide

quota in excess of 9.55 million pounds.  AR 2951–54.

This amendment was submitted to NMFS by the Mid-Atlantic Council, which triggered

the agency's review and public notice and comment process.  On May 7, 2020, a final

Environmental Impact Statement (the "Final EIS") was submitted to NMFS.  AR 2875.  The

Final EIS considered in detail the impacts of the proposed alternatives, examining their

ecological, economic, and social effects.  AR 2932-2961.  The Final EIS considered that the

recommended quota threshold of 9.55 million pounds had been exceeded in twenty-one of the

preceding twenty-six years and, in a high-quota year, could increase New York's share of the

catch from 7.65% to 9.85%.  AR 2944.  The Final EIS explained that the change from the 1993

Allocation Rule to the 2020 Allocation Rule balanced the need for increased equity in the

allocations among the states when annual coastwide quotas are near or above average, with the

need to minimize the potential economic loss in years of scarcity to states that already had a

higher proportion of the current summer flounder quota and thus a higher economic dependence

on the summer flounder fishery.  AR 2496.

The Final EIS also considered the proposals put forth by New York and explained the

concerns with those proposals.  The Final EIS explained that adopting a coast-wide quota with

no state-by-state allocation for a limited period of time could result in "derby fishing conditions,

. . . difficulty in developing coastwide management measures, and . . . an influx of latent effort."

AR 2967.

After the proposed rule was published in the Federal Register, *see* 85 Fed. Reg. 48,660,

New York timely submitted public comments reiterating its opposition to the proposed

amendment on the same grounds it had articulated in prior comments (and articulates in this

litigation).  AR 3733-3736.  In its October 15, 2020 Record of Decision, NMFS noted that New

York's was the only public comment in opposition to the adoption of the 2020 Allocation Rule.

AR 4022.

 In considering New York's comments, NMFS pointed out that New York had failed to

identify any superior landings data.  AR  4023.  It determined that since commercial landings

after 1993 had been constrained by the allocations established by 1980-1989 landings data, any

future landings data merely would reflect the same results.  AR  4023.  NMFS also explained

that it had rejected New York's proposal to base the allocation largely or entirely on biomass

distribution.  *See* AR 4023.  NMFS explained that basing the allocation of state quotas largely or

entirely on biomass distribution would result in substantial reductions in allocations for states

that had developed economic dependence on the summer flounder fishery due to the historical

allocation formula.  AR 4023.  NMFS further explained that adopting New York's proposal also

would increase the operation costs of those states and would increase the cost of their

infrastructure relative to the value of the fishery overall.  AR 4023.  At bottom, NMFS selected

the 2020 Allocation Rule because it "balance[d] preservation of historical state access and

infrastructure at recent quota levels, with an intent of providing equitability among states when

the stock and quota are at higher levels."  AR 4023.

 After the review and public notice and comment process, NMFS approved the 2020

Allocation Rule, which was published in the Federal Register on December 14, 2020, to take

effect on January 1, 2021.  85 Fed. Reg. 80,661 (codified at 50 C.F.R. § 648.102(c)); AR 4082.

### D.  The 2021 Specification

 The state-by-state allocations established in the 2020 Allocation Rule do not themselves

establish the number of fish that can be landed by fishermen in each state in a particular year.

Those numbers are set through the "specifications process."  *See* 50 C.F.R. § 648.102(a).

Pursuant to that process, each year, the Mid-Atlantic Council and the Atlantic States

Commission's Summer Flounder, Scup, and Black Sea Bass Management Board (the "Board")

meet in order to make recommendations for annual commercial quotas, recreational harvest

limits, and other commercial and recreational management measures, such as minimum size

limits, possession limits, seasons, gear requirements and restrictions and any other necessary

measures.  *See* 50 C.F.R. § 648.100, 101, 102(b); *see, e.g.*, AR 118-19.  Based on these

recommendations, NMFS publishes a proposed rule to, among other things, implement a coast-

wide commercial summer flounder quota, which the regulations require to be distributed in

accordance with the 2020 Allocation Rule.  *See* 50 C.F.R. § 648.102(c).  The proposed rule is

subject to public comment and after considering public comment, NMFS publishes a final rule in

the Federal Register setting the annual specifications for a particular year or years.  50 C.F.R. §

648.102(c).

On November 17, 2020, NMFS proposed the 2021 Specifications Rule that distributes the

2021 coastwide quota among the states according to the formula in the 2020 Allocation Rule.  85

Fed. Reg. 75,253.  NMFS proposed these state-by-state quotas to replace previously established

2021 quotas that had been based on the 1993 Allocation Rule.  *See* 84 Fed. Reg. 54,041 (Oct. 9,

2019).  On December 2, 2020, New York submitted comments to Commerce explaining that the

proposed state quotas for 2021 and the application of the 2020 Allocation Rule to calculate those

quotas are contrary to the MSA.  AR 4610–11.  New York's comments reiterated its prior

comments from the rulemaking process for the 2020 Allocation Rule.  AR 4610–11.  On

December 21, 2021, NMFS published the final 2021 Specifications Rule.  85 Fed. Reg. 82,946;

AR 4627.

### III.   Procedural History

#### A.  New York Commences This Suit And The
#### Parties Cross-Move For Summary Judgment

New York commenced this action by filing the Complaint.[5]  (Compl. [ECF No. 1]).  New York's complaint asserts four claims for relief: (1) that the 2020 Allocation Rule is not in accordance with law because it violates the MSA, (Compl. ¶¶ 89–95); (2) that the 2020 Allocation Rule is arbitrary and capricious under the APA because it ignores important and relevant data, (Compl. ¶¶ 96–100); (3) that the 2021 Specifications Rule is not in accordance with law because its state-by-state quota allocation violates the MSA, (Compl. ¶¶ 101–107); and (4) that the 2021 Specifications Rule is arbitrary and capricious under the APA because its quota allocation ignores important and relevant data, (Compl. ¶¶ 108–112).  The complaint requests that the Court vacate the 2020 Allocation Rule and the state-by-state quotas in the 2021 Specifications Rule and remand them to Commerce, but not reinstate the 1993 Allocation Rule or the specification rule that was based on the 1993 Allocation Rule.  (Compl., wherefore).  The parties subsequently filed a joint letter, which the Court later so ordered [ECF No. 16], seeking an expedited briefing schedule so as to resolve the case on dispositive motions.  [ECF No. 13].

Pursuant to that briefing schedule, the parties filed cross-motions for summary judgment. [ECF Nos. 22, 26].  In support of its motion, New York filed a memorandum of law, with several

---

[5] New York previously challenged the 1993 Allocation Rule and the implementation of the 1993 Allocation Rule in the 2020 and 2021 quotas in a related action before this Court.  *New York v. Raimondo*, Case No. 1:19-cv-09380-MKV (S.D.N.Y. filed Oct. 10, 2019).  After this current action was filed, the Court dismissed the prior action as moot on the grounds that the 1993 Allocation Rule had been superseded by the 2020 Allocation Rule and that New York had filed a subsequent suit challenging the 2020 Allocation Rule.  Order of Dismissal, Dkt. No. 54, *New York v. Raimondo*, Case No. 1:19-cv-09380-MKV (S.D.N.Y. filed Oct. 10, 2019).  New York also previously had challenged its 2019 quota and the application of the 1993 Allocation Rule to set that quota.  *New York v. Ross*, Case No. 2:19-cv-00259-SJF-ARL (E.D.N.Y. filed Jan. 14, 2019).  After Defendants filed a letter advising the Court that a proposed regulation revising the 1993 Allocation Rule would be submitted to NMFS for further review, Letter, *New York v. Ross*, Case No. 2:19-cv-00259-SJF-ARL (E.D.N.Y. filed Jan. 14, 2019), that case was dismissed without a decision.  Order Dismissing Case, *New York v. Ross*, Case No. 2:19-cv-00259-SJF-ARL (E.D.N.Y. filed Jan. 14, 2019).

attached exhibits.  (Pl. Br. [ECF No. 23]).  In support of its cross-motion and in opposition to New York's motion, Commerce filed a memorandum of law.  (Def. Br. [ECF No. 27]).  New York subsequently filed a memorandum of law both in opposition to Commerce's cross-motion and in reply to Commerce's opposition.  (Pl. Reply [ECF No. 28]).  Commerce filed a reply. (Def. Reply [ECF No. 29]).  With leave of the Court [ECF No. 25], Suffolk County filed an amicus brief in support New York's motion.  (Suffolk Br. [ECF No. 24-1]).

## B.  The 2022 Specifications Rule

On January 21, 2022, the parties filed a joint letter.  [ECF No. 31].  In that letter, the parties advised the Court that the 2021 Specifications Rule had expired and was replaced by the 2022 Specifications Rule.  [ECF No. 31].  As such, the parties agreed, New York's claims premised on the 2021 Specifications Rule were moot.  [ECF No. 31].  New York, with written consent from Commerce, filed an Amended Complaint, which reiterated the allegations in the initial Complaint, but dropped the claims premised on the alleged unlawfulness of the 2021 Specifications Rule and replaced them with claims premised on the alleged unlawfulness of the new 2022 Specifications Rule.  [ECF No. 32].  Nonetheless, the parties agree (Def. Br. 24; Pl. Br. 2) that New York's challenge in its Amended Complaint to the 2022 Specifications Rule is derivative of its challenge to the 2020 Allocation Rule because the 2020 Allocation Rule is still used by NMFS each year to calculate the distribution of the coastwide quota among the states. *See* 50 C.F.R. § 648.102(c).  Specifically, they agree that if the Court finds the 2020 Allocation Rule to be valid, "that ruling will also dispose of New York's claims regarding the 2022 quotas and the Court can enter final judgment for Commerce."  [ECF No. 31].  Conversely, they agree that, should the Court rule in favor of New York, the parties will submit briefs on the appropriate remedy with respect to both the 2020 rule and the appropriate treatment of the 2022 quotas.

[ECF No. 31]. Accordingly, the Court has jurisdiction to review the lawfulness of the 2020 Allocation Rule. *See Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012) (holding that a case becomes moot only when it is impossible for a court to grant any effectual relief to the prevailing party).

## LEGAL STANDARDS

### I.    Summary Judgment

A party is entitled to summary judgment when there is no "genuine dispute as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Where, as here, an APA-based challenge to an agency's action presents a pure question of law, "a district court's procedural decision to award summary judgment is generally appropriate." *Aleutian Cap. Partners, LLC v. Scalia*, 975 F.3d 220, 229 (2d Cir. 2020); *accord Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) ("[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The 'entire case' on review is a question of law."). Generally, "a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc'y v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997); *see also Brodsky v. U.S. Nuclear Regul. Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013) ([T]he APA contemplates that, in deciding a challenge to agency action, a court will review the administrative record to ensure 'that the agency examined the

relevant data and articulated a satisfactory explanation for its action.'"  (quoting *Nat'l Res. Def. Council v. U.S. E.P.A.*, 658 F.3d 200, 215 (2d Cir. 2011)).

## II.    Judicial Review Of Agency Action

The MSA provides that Commerce's actions are to be reviewed under the standards set forth in the APA.  16 U.S.C. § 1885(f)(1)(B).  Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  To determine whether the agency's actions were "arbitrary and capricious," courts consider whether the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Nat'l Res. Def. Council v. EPA*, 808 F.3d 556, (2d Cir. 2015) (quoting *Islander E. Pipeline Co. v. McCarthy*, 525 F.3d 141, 150–51 (2d Cir. 2008)).  Agency action is thus lawful if the agency considers the relevant factors.  *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"The scope of review under the 'arbitrary and capricious standard is narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43.  Agency action must be upheld if there is "sufficient evidence in the record to provide rational support for the choice made by the agency."  *Constitution Pipeline Co. v. N.Y. State Dep't of Envtl. Conservation*, 868 F.3d 87, 102 (2d Cir. 2017) (quoting *Islander E. Pipeline*, 525 F.3d at 152).  This standard of review is highly deferential.  *See Cty. of Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 802 F.3d 413, 430 (2d Cir. 2015); *Guertin v. United States*, 743 F.3d 382, 385 (2d Cir. 2014).

Courts are "particularly deferential" to the agency "where the agency's particular technical expertise is involved, as is the case in fishery management." *New York v. Locke*, No. 08-CV-2503 (NG) (RLM), 2010 WL 11627431, at *6 (E.D.N.Y. June 30, 2010) (quoting *Boatmen v. Gutierrez*, 429 F. Supp. 2d 543, 547 (E.D.N.Y. 2006)); *Nat'l Res. Def. Council*, 808 F.3d at 569 ("We afford the agency's decision greater deference regarding factual questions involving scientific matters in its area of technical expertise."); *see also Balt. Gas & Elec. Co. v. Nat'l Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) ("[Where the agency] is making predictions, within its area of special expertise, at the frontiers of science, . . . as opposed to simple findings of fact, a reviewing court must generally be at its most deferential."). As other Courts in this Circuit have held in the context of the MSA, "[t]he Secretary's determination of what fishery conservation and management measures would be in the nation's best interest is 'a classic example of a factual dispute the resolution of which implicates substantial agency expertise.'" *Connecticut v. Daley*, 53 F. Supp. 2d 147, 157 (D. Conn. 1999), *aff'd sub nom. Connecticut v. U.S. Dep't of Com.*, 204 F.3d 413 (2d Cir. 2000) (quoting *Nat'l Fisheries Inst. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990)). Thus, it is

> especially appropriate for the court to defer to the expertise and experience of those individuals and entities—the Secretary, the Councils, and their advisors—whom the [MSA] charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors.

*Nat'l Fisheries Inst.*, 732 F. Supp. at 223–24.

## DISCUSSION

**I.   The 2020 Allocation Rule Is Consistent With The MSA Since NMFS Appropriately Balanced The Ten National Standards In Its Adoption Of The 2020 Allocation Rule**

New York challenges the 2020 Allocation Rule, arguing that NMFS's decision disregarded four of the ten national standards, specifically the second, fourth, fifth, and seventh

national standards.  (Pl. Br. 16–17).  New York also argues that NMFS's decision improperly prioritized the eighth national standard.  (Pl. Reply 8).  At bottom however, New York's issue with the 2020 Allocation Rule is that the rule continues to use historical landings data from the 1980s as the basis for allocating each state a proportion of the summer flounder coastwide quota up to 9.55 million pounds.  New York contends that, since the 1980s, the summer flounder fishery has geographically shifted northward toward the waters off Long Island.  Accordingly, New York claims that the 2020 Allocation Rule violates the MSA and APA because, it contends, quotas should instead be set in accordance with current fish location data to ensure that the allocations are fair to the New York fishing industry and minimize total costs to the Mid-Atlantic fishing industry.

Having carefully reviewed the administrative record, the Court finds that NMFS did not violate the NMFS when it approved the 2020 Allocation Rule.  Although New York claims that the 2020 Allocation Rule runs afoul of four of the ten national standards (Pl. Br. 17), NMFS has broad discretion to strike an appropriate balance among all ten of the national standards.  As New York acknowledges (Pl. Br. 4), NMFS must ensure that management plans, amendments, and implementing regulations be consistent with all ten of the MSA's national standards.  As other courts have recognized, there is some tension among these ten standards.  *See All. Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996) ("Congress required the Secretary to exercise discretion and judgment in balancing among the conflicting national standards in section 1851."); *Conservation L. Found. v. Ross*, 374 F. Supp. 3d 77, 91 (D.D.C. 2019) ("The ten national standards [] compete for attention."); *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 68 (D.D.C. 2014) ("[T]he National Standards require the agency to balance several competing considerations in developing FMPs.").  For example, the MSA requires that NMFS balance

optimum yield with conservation, minimization of costs and avoidance of duplication, and minimization of adverse economic impacts to communities that rely on fishing, and do this all while considering the efficiency in the utilization of fishery resources.  16 U.S.C.A. §§ 1851(a)(1), (5), (7), (8); *see also Conservation L. Found.*, 374 F. Supp. 3d at 91.

As other Courts have held, this structure demonstrates that "Congress delegated to NMFS the discretion to strike an appropriate balance, and that there is no statutory mandate that one National Standard be maximized at the expense of others."  *Oceana, Inc.*, 24 F. Supp. 3d at 68; *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1102 n. 15 (9th Cir. 2012) ("The National Standards, and the MSA more generally, require NMFS to balance conservation with yield, not favor one at the expense of the other."); *Conservation L. Found. v. Evans*, 360 F.3d 21, 28 (1st Cir. 2004) ("We think by using the term 'practicable' [in some of the ten national standards,] Congress intended [] to allow for the application of agency expertise and discretion in determining how best to manage fishery resources.").

It's clear from the administrative record that NMFS appropriately considered all the ten national standards and, in exercising its discretion to formulate the 2020 Allocation Rule, did not violate the MSA.  Before finalizing the 2020 Allocation Rule, NMFS considered, in detail, several alternatives to the 1993 Allocation Rule, AR 1144-1165, including two that were proposed by New York, AR 1831-1834.  NMFS weighed the ecological, economic, and social effects of each alternative plan, AR 2932-2961, including those put forth by New York.  AR 2967.  NMFS exercised its agency expertise and discretion in determining how best to balance the ten national standards and decided to adopt the 2020 Allocation Rule because it "balance[d] preservation of historical state access and infrastructure at recent quota levels, with an intent of providing equitability among states when the stock and quota are at higher levels."  AR 4023.

17

Although New York takes issue with how NMFS balanced these factors, and specifically how NMFS prioritized certain factors to the detriment of New York's allocation, the Court will not substitute its judgment for that of NMFS.  *See Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43.  Nonetheless, the Court has carefully considered New York's argument that the 2020 Allocation Rule is not in accordance with the MSA because NMFS completely disregarded several of the national standards, specifically the second, fourth, fifth, and seventh national standards.  (Pl. Br. 16–17).  As discussed below, NMFS appropriately considered all ten of the national standards and appropriately exercised its agency expertise and discretion in determining how best to balance those standards.

### A. The 2020 Allocation Rule Is Based Upon The Best Scientific Information Available (Standard Two)

In challenging the 2020 Allocation Rule, New York centers its arguments on an allegation that, for two reasons, NMFS failed to use the "best scientific information available" when it approved the use of the 2020 Allocation Rule for determining state-by-state summer flounder quotas.  (Pl. Br. 17).  First, it claims, the allocations of summer flounder quotas up to 9.55 million pounds is based on summer flounder commercial landings data that was initially reported by states from 1980 to 1989.  *See* 57 Fed. Reg. at 57,359; AR 2951–54.  New York argues that this is not the best scientific information available because, since the 1980s, summer flounder distribution, biomass, and fishing effort have shifted further up the east coast.  (Pl. Br. 18–19).  Second, New York argues that NMFS did not rely on any scientific evidence at all when it decided to allocate evenly among the states summer flounder quotas in excess of 9.55 million pounds.  (Pl. Br. 19).

The Second National Standard directs that "[c]onservation and management measures shall be based upon the best scientific information available."  16 U.S.C. § 1851(a)(2).  This

standard requires that rules issued by the NMFS be based on a thorough review of all the relevant information available at the time. *The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005), *aff'd sub nom. Oceana, Inc. v. Gutierrez*, 488 F.3d 1020 (D.C. Cir. 2007); *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 195 (D.D.C. 2014) (same).  NMFS may not disregard superior data in reaching its conclusions.  *The Ocean Conservancy*, 394 F. Supp. 2d at 157.  Nonetheless, as the D.C. Circuit explained in interpreting statutory language analogous to that of National Standard two, the agency "must utilize the 'best scientific . . . data *available*,' not the best scientific data *possible*."  *Building Industry Ass'n of Superior Cal. v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001) (emphasis in original).  Accordingly, NMFS need not "rely upon perfect or entirely consistent data."  *The Ocean Conservancy*, 394 F. Supp. 2d at 157; *see also Building Industry Ass'n*, 247 F.3d at 1246 ("[T]he [NMFS must] utilize the best scientific data *available*, not the best scientific data *possible*." (internal quotation marks omitted) (emphasis in original)).

The agency's conclusion need not be airtight and indisputable.  "When an agency relies on the analysis and opinion of experts and employs the best evidence available, the fact that the evidence is 'weak,' and thus not dispositive, does not render the agency's determination 'arbitrary and capricious.'"  *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1336 (9th Cir. 1992).  This Court therefore may not champion a competing interpretation of the data over an agency's conclusion that finds support in the record.  *Id.* ("We agree with the district court that the Secretary acted within his discretion in choosing the data on which to rely . . . .").  Nor should this Court pretend to have an expertise in scientific matters greater than the challenged agency.  *See Balt. Gas & Elec.*, 462 U.S. at 103 ("[Where the agency] is making predictions, within its

area of special expertise, at the frontiers of science, . . . as opposed to simple findings of fact, a reviewing court must generally be at its most deferential.").

New York's argument that the NMFS ignored data showing a northward shift in the summer flounder fishery is without merit.  The administrative record belies New York's contention, demonstrating that the northward shift in the summer flounder fishery was extensively discussed in consideration of the 2020 Allocation Rule.  *See, e.g.*, AR 2877 (identifying shift in biomass as underlying purpose of rulemaking); AR 2977-2979 (discussing scientific evidence of shift); AR 3100-3101 (deliberating whether to shift the allocation northward to follow the shift in geographic location of the summer flounder fishery).  The draft EIS made clear that the very reason that the Mid-Atlantic Council was considering whether to modify the 1993 Allocation Rule was specifically *because* of the change in summer flounder distribution, biomass, and fishing effort since the implementation of the 1993 Allocation Rule. AR 1112.  Indeed, the 2020 Allocation Rule changed the distribution among the states of summer flounder in excess of 9.55 million pounds, and increased the allocation of that quota to New York, specifically because the data reflected a northward shift in the summer flounder fishery toward the waters off Long Island.  *See* AR 4023.  Nonetheless, NMFS exercised its discretion and based state-by-state quotas of summer flounder up to 9.55 million pounds on fish landings data to ensure the preservation of historical state access and infrastructure in states that had historically relied on the fishing industry, AR 4023, legitimate considerations to be weighed under the fourth and eighth national standards.  *See* 16 U.S.C. §§ 1851(a)(4), (8).

New York seems to take issue with the fact that, in considering all of the best scientific evidence available, NMFS did not decide to perfectly allocate state-by-state quotas with the data reflecting the current location of summer flounder distribution and biomass.  (Pl. Br. 19).

However, although NMFS must use the best scientific information available, there is no requirement in the MSA that NMFS prioritize one data set against competing distinct data sets. In fact, as other courts have held, "it is well established that NMFS 'may choose' between 'conflicting facts and opinions,' so long as it 'justifies the choice.'" *Ctr. for Biological Diversity v. Blank*, 933 F. Supp. 2d 125, 149 (D.D.C. 2013) (quoting *Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 890 (9th Cir. 2010)); *see also Greenpeace Action*, 14 F.3d at 1336 ("When an agency relies on the analysis and opinion of experts and employs the best evidence available, the fact that the evidence is 'weak,' and thus not dispositive, does not render the agency's determination 'arbitrary and capricious.'").

NMFS, exercising its agency expertise and discretion, opted to use fish landing data, as opposed to fish location data, as the basis for calculating state-by-state allocations up to 9.55 million pounds.  AR 2944.  In opposing this discretionary choice, New York does not assert that there is more recent data reflecting fish landings which NMFS failed to consider.  In fact, New York cannot make such an assertion because there is no such data.  As NMFS explicitly considered when adopting the 2020 Allocation Rule, since commercial landings after 1993 had been constrained by the allocations established by 1980-1989 landings data, any future landings data merely would reflect the same results.  AR 4023.  To the extent that New York seeks that NMFS adopt its proposed plan to eliminate a state-by-state allocation for an interim period and use that time to gather updated data about summer flounder catch, AR 1834, NMFS considered this proposed plan during the rulemaking process and, in its discretion, rejected it.  AR 2967.  It concluded that New York's plan would result in "derby fishing conditions, . . . difficulty in developing coastwide management measures, and . . . an influx of latent effort."  AR 2967.  Such a determination is "a classic example of a factual dispute the resolution of which implicates

substantial agency expertise.'" *Connecticut*, 53 F. Supp. 2d at 157 (quoting *Nat'l Fisheries Inst.*, 732 F. Supp. at 223).  Accordingly, the Court will not second guess NMFS' conclusion.  *See Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43. ("[A] court is not to substitute its judgment for that of the agency.").

The cases that New York cites, *Guindon v. Pritzker*, 31 F. Supp. 3d 169 (D.D.C. 2019) and *Oceana, Inc. v. Ross*, 483 F. Supp. 3d 764 (N.D. Cal. 2020), undermine rather than support its argument.  In *Guindon*, which also involved a challenge to an FMP, the district court found that NMFS had violated National Standard two when it disregarded the most recent landings data in favor of older and less accurate landings data.  *Guindon*, 31 F. Supp. 3d at 195.  Here, there was no more recent set of landings data upon which to rely.  Moreover, to the extent that New York asserts that NMFS should have relied on current fish location when it formulated the 2020 Allocation Rule, the administrative record clearly shows that it *did* rely on this data.  AR 4023. That it did not use this data in the precise way or to reach the result that New York would have preferred, does not mean that NMFS completely disregarded it or that its decision is inconsistent with the MSA.

In *Oceana*, which arose out of a challenge to fishing limits, NMFS by its own admission "wholly disregard[ed]" two recent peer-reviewed studies on anchovy biomass in setting anchovy catch limits.  *Oceana*, 483 F. Supp. 3d at 780-81.  Again, here, NMFS did not wholly disregard the fish location data and indeed, it was this very data that precipitated the rule change that is at issue in this case.  *See, e.g.*, AR 1112.

As made clear from the administrative record, in proposing the 2020 Allocation Rule, NMFS considered, in explicit detail, the "best scientific information available."  *See, e.g.*, AR 2944, 3100-3101, 4023.  That New York may disagree with how the agency ultimately balanced

the information it considered is not sufficient to warrant vacatur of the agency's ruling as

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A).  Accordingly, the Court finds that NMFS did not violate the second national

standard when it approved the use of the 2020 Allocation Rule.

### B.   The 2020 Allocation Rule Is Fair And Equitable (Standard Four)

New York argues that the 2020 Allocation is not fair and equitable to all fisherman

because, under the current allocation, North Carolina and Virginia receive a greater quota share

than New York, even though a greater concentration of summer flounder are now located in the

waters off Long Island.  (Pl. Br. 20–21).

The fourth national standard provides that management measures "shall not discriminate

between residents of different States" and that "[i]f it becomes necessary to allocate or assign

fishing privileges among various United States fishermen," the allocation shall be "fair and

equitable to all such fishermen."  16 U.S.C. § 1851(a)(4).  In making allocations, NMFS "should

make an initial estimate of the relative benefits and hardships imposed by the allocation, and

compare its consequences with those of alternative allocation schemes, including the status quo."

50 C.F.R. 600.325(c)(3)(i)(B).  NMFS is also required to consider the dependence by coastal

communities on the fishery.  50 C.F.R. § 600.325(c)(3)(iv).

In adopting the 2020 Allocation Rule, NMFS carefully considered the impact of various

alternative proposals, including the status quo, on coastal communities.  AR 3099-3114.  NMFS

acknowledged New York's concern that the reliance on the 1980-1989 landings data resulted in

negative socio-economic impacts for New York and that there was a disparity in the availability

of summer flounder in the waters off of New York in comparison to its current allocation.  AR

3100.  NMFS, in the exercise of its discretion, nonetheless balanced New York's concern with

23

the fact that "[o]ther states have experienced long-term positive socioeconomic impacts from the existing quota allocations, in particular Rhode Island, New Jersey, Virginia, and North Carolina . . . ." AR 3100.  Accordingly, NMFS adopted the 2020 Allocation Rule in order to balance the need to minimize the adverse economic impact on more southern states with the need to provide more equity to northern states in years of abundance.  AR 283, 3107, 3112.

Although New York may disagree with the decision of NMFS, that decision is supported by "sufficient evidence in the record to provide rational support for the choice made by the agency." *Constitution Pipeline Co.*, 868 F.3d at 102 (quoting *Islander E. Pipeline*, 525 F.3d at 152).  While New York may disagree with the balancing of the ten national standards by NMFS, the Court will not vacate the 2020 Allocation Rule based simply on a disagreement with NMFS' discretionary choice.  *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43.  Accordingly, the Court finds that NMFS did not violate the fourth national standard when it approved the use of the 2020 Allocation Rule.

### C.  The 2020 Allocation Rule Properly Considers Cost And Efficiency (Standards Five And Seven)

New York also asserts that the 2020 Allocation Rule disregards cost and efficiency in contravention of the fifth and seventh national standards.  (Pl. Br. 22–23).  Specifically, New York points to the fact that, due to the northern shift in summer flounder biomass, there has been a significant increase in the amount of summer flounder that must be caught off the waters of New York, but then landed hundreds of miles away in Virginia and North Carolina.  New York contends that this results in significant cost increases and inefficiencies that would be reduced had NMFS allocated state-by-state quotas based solely on fish location data.

National Standards five and seven require FMPs, "where practicable," to "consider efficiency in the utilization of fishery resources" and "minimize costs and avoid unnecessary

duplication."  16 U.S.C. §§ 1851(a)(5), (7).  The MSA states that in considering efficiency in the

utilization of fishery resources, "no such measure shall have economic allocation as its sole

purpose."  16 U.S.C. § 1851(a)(5).

First, both the fifth and seventh standards explicitly state that management plans must

consider efficiency and minimize costs "*where practicable*."  16 U.S.C. §§ 1851(a)(5), (7)

(emphasis added).  NMFS need not prioritize efficiency and the reduction of costs over other

national standards such as, for example, the eighth standard, which directs that any management

plan take into account the importance of fishing resources to fishing communities.  16 U.S.C. §

1851(a)(8); *accord J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138, 1155 (E.D. Va. 1995)

(holding that the fifth national standard "does not require absolute efficiency"); 50 C.F.R. §

602.15(b)(1) (management measures should result in "as efficient a fishery as is practicable or

desirable" but may conflict with other "legitimate social or biological objectives of fishery

management")).  The implementing regulations for National Standard five make clear that

inefficient measures may be included in an FMP if they contribute to other social or economic

objectives; it is only when no other such benefits are present that efficiencies should be

considered obligatory.  50 C.F.R. § 600.330(b)(2)(ii).

It is clear from the administrative record that NMSF carefully considered efficiency and

the need to minimize costs.  In formulating the 2020 Allocation Rule, NMFS "considered other

alternatives that would possibly more directly address biomass distribution and its impacts on

efficiency."  AR 3141.  However, NMFS "determined that this was not the best option to balance

meeting other FMP objectives and national standards."  AR 3141.

Moreover, NMFS carefully considered how the alternative allocation proposals would

impact cost, and determined that shifting quotas from southern states to northern states could

actually *increase* costs.  Specifically, NMFS considered that, because North Carolina and Virginia are allocated greater shares of summer flounder, the current fleet in those states is oriented toward large offshore vessels, which are more efficient.  AR 3115.  NMFS considered that shifting the flounder allocation toward New York's fleet of smaller, less-efficient inshore vessels might negate any cost savings from decreased average trip length.  AR 3115.

The administrative record makes clear that NMFS did not disregard cost and efficiency when it adopted the 2020 Allocation Rule.  Though New York may disagree with the decision of NMFS to implement the 2020 Allocation Rule, that decision is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Accordingly, the Court finds that NMFS did not violate the fifth or seventh national standard when it approved the use of the 2020 Allocation Rule.

### D.  The 2020 Allocation Rule Properly Considers The Importance Of Fishery Resources To Fishing Communities (Standard Eight)

In its opposition to the 2020 Allocation Rule, New York also appears to take issue with the weight that NMFS gave to the eighth national standard.  That standard states that "[c]onservation and management measures shall . . . take into account the importance of fishery resources to fishing communities . . . in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities."  16 U.S.C. § 1851(a)(8).

New York contends that NMFS improperly prioritized this standard over the second standard.  Specifically, New York asserts that the MSA does not give NMFS discretion to weigh "the best available science against the interests of some fishing communities and adopt a fishery management measure that does not reflect the best available science."  (Pl. Reply 8).  However, as discussed above, *see supra* Part I.A, the 2020 Allocation Rule *is* based upon the best scientific

information available.  That NMFS may have not used that data in the *way* that New York would

have preferred does not mean that NMFS disregarded the data itself.

### E. The 2020 Allocation Rule Properly Considers
### The Safety Of Human Life At Sea (Standard Ten)

Suffolk County, as amicus, also argues that the 2020 Allocation rule disregards fishermen

safety.  Suffolk County contends that the longer trips necessary for ships based in southern states

to reach summer flounder fisheries in more northern regions increases the risk to human safety.

(Suffolk Br. 10).

The tenth national standard provides that "[c]onservation and management measures

shall, to the extent practicable, promote the safety of human life at sea."  16 U.S.C. §

1851(a)(10).  As a preliminary matter, the Court need not address this issue because it was not

raised by either party in its briefs.  *See Bano v. Union Carbide Corp.*, 273 F.3d 120, 127 n.5 (2d

Cir. 2001) (declining to reach an argument raised by amici curiae because the argument was not

raised by any party to the litigation at either the district or appellate court proceedings).

Nonetheless, the Court concludes that NMFS appropriately considered human safety.  In

formulating the 2020 Allocation Rule, NMFS specifically concluded that the changes to the

allocation formula were "not expected to alter fishery operations or conditions in a way that

would reduce safety at sea."  AR 3143.  Moreover, NMFS rejected New York's proposal to

eliminate a state-by-state allocation for an interim period and use that time to gather updated data

about summer flounder catch precisely because such a plan could result in "derby fishing

conditions," which would only *increase* the risk to human safety.  AR 2967.

Accordingly, the administrative record makes clear that NMFS appropriately considered

the risk to human safety in formulating the 2020 Allocation Rule.

\*     \*     \*

The Court has carefully reviewed the administrative record and finds that NMFS, in formulating the 2020 Allocation Rule, considered all the appropriate factors, explicitly considering, balancing, and applying all ten MSA standards and evaluating them against the proposed alternatives.  *See, e.g.*, AR 3137-3143.  In spite of New York's repeated charge that NMFS has failed to account for the northward shift in summer flounder fishery, the administrative record is clear that NMFS *did* consider this shift, but in its expertise and discretion, weighed that fact against other considerations when adopting the 2020 Allocation Rule.  *See, e.g.*, AR 2877 (identifying shift in biomass as underlying purpose of rulemaking); AR 2977-2979 (discussing scientific evidence of shift); AR 3100-3101 (deliberating whether to shift the allocation northward to follow the shift in geographic location of the summer flounder fishery).  NMFS exercised its agency expertise and discretion in determining how best to balance the ten national standards and decided to adopt the 2020 Allocation Rule because it "balance[d] preservation of historical state access and infrastructure at recent quota levels, with an intent of providing equitability among states when the stock and quota are at higher levels."  AR 4023.

The Court cannot find that NMFS' actions were without sufficient evidence in the record nor that its actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Though New York may disagree with how NMFS balanced the ten national standards, the Court will not intervene to substitute its judgment for that of the agency.  Accordingly, the Court finds that on the administrative record, Commerce is entitled to judgment as a matter of law.

II.     **The 2020 Allocation Rule Is Not Arbitrary Or Capricious**

The 2020 Allocation Rule also is not arbitrary and capricious.  It is well settled that an

agency action is arbitrary and capricious when it

> relied on factors which Congress has not intended it to consider,
> entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the
> evidence before the agency, or is so implausible that it could not be
> ascribed to a difference in view or the product of agency expertise."

*Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43.  For the reasons discussed above, *see supra*

Part I, the Court finds that the 2020 Allocation Rule is not arbitrary and capricious.  Indeed, the

Court finds that NMFS carefully considered all the appropriate factors, explicitly considering

and applying all ten MSA standards and evaluating them against the proposed alternatives.  *See,*

*e.g.*, AR 3137-3143.

NMFS published the proposed rule in the Federal Register and New York submitted

public comments.  *See* 85 Fed. Reg. 48,660; AR 3733-3736.  Significantly, New York's was the

only public comment in opposition to the adoption of the 2020 Allocation Rule.  AR 4022.  New

York's alternative proposals for summer flounder allocation plans were carefully considered by

NMFS, AR  4023, and were rejected.  NMFS carefully and thoroughly explained why it rejected

the proposals made by New York.  AR  4023.  New York now seeks the Court to intervene

because it disagrees with the outcome of the rulemaking proceedings.  However, the Court will

not "substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S.

at 43.

## <u>CONCLUSION</u>

New York concedes that if the Court finds the 2020 Allocation Rule to be valid, "that ruling will also dispose of New York's claims regarding the 2022 quotas and the Court can enter final judgment for Commerce."  [ECF No. 31].

For the foregoing reasons, the Court finds that the agency action here was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.  Accordingly, New York's Motion for Summary Judgement is DENIED and Commerce's Motion for Summary Judgment is GRANTED.

The Clerk of Court is respectfully requested to terminate docket entries 22 and 26 and to close this case.

**SO ORDERED.**

**Date:   March 29, 2022**
**New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**